Good morning, Your Honors. Please accord the public's back for the appellant, Dr. Nassif. On the way in this morning, I was listening to the news, and I heard one of the advertisements for the radial keratotomy procedure, which for those of us that wear glasses, which I noticed was a number of us in the courtroom, that could have application to us because we may want to have that. It's cosmetic, and it's elective. I don't think, on behalf of the Court of Appeals, that it's not true. I don't really understand the relevance of this. He was asked whether he'd seen a doctor at all in the past five years, and he said no. That's not true, right? Quite aside from whether this was surgery or wasn't surgery or whatever. Correct. And he also later admits that he knew in 1995 that he had irregular astigmatism. And I gather that the record is clear that irregular astigmatism, unlike astigmatism, is a disease or defect of the eye. No, I don't think we have a record on that, Your Honor. Irregular just means that it's nonconforming. It doesn't mean it's any more serious than irregular astigmatism, again, which most of us that wear glasses suffer from. That's a distinction without a difference in this case. Well, the record doesn't seem to suggest that. From what I could see about some of the medical evidence that's in the record, it seems to suggest that an irregular I don't know what it means, but it seems to suggest that it is. It doesn't sound good. No, it's not that it doesn't sound good. It's that it says that it is a possible result of this surgery and that it is not the same as astigmatism. It's something else. Well, the only problem, I understand your point, but it's one we really both don't know since we're in another profession. But I think the other point is that it was something that was certainly treatable in the same way as the irregular astigmatism. So I don't think that gets us to one point or the other. I would note to you, too, Your Honor, that we're talking about here an eye doctor. And in Thompson v. Occidental, which is the seminal California Supreme Court case in this area, it happened to be Dr. Thompson. And in that case, Dr. Thompson had, among other medical conditions, among other medical conditions, phlebitis, the lower legs. And a host of other problems, including heart disease. Your Honor, when we talk — I took this case because I labor in this field, and if I could, let me just reserve five minutes, too. And in the context, I don't believe that when we get to a cosmetic matter that I — and I labored to think of how I could compare this to other things that we would all think of, a face peel, perhaps, a receding chin that you would go to either a maxillofacial physician dentist or you would go to a plastic surgeon for, an eye lift, things that aren't — but things that aren't medically necessary, but are cosmetic. If they ask you on the application whether you've seen a doctor and you had a breast implant, you could not put it down? Well, it's not that you couldn't put it down, but it's that they could not then rescind it based on that, because our law protects us as California citizens in that regard. Thompson v. Oxenell says minor indispositions and things that do not come to the realm of reasonableness, even in the context of a physician, Dr. Thompson, cannot be then be used against us. Your Honor, let me suggest to you, where are we here? This is after the horse is out of the barn that the insurance company now wants to allege his stuff. It's after he has horrible cataracts and now wants to collect benefits. Let me ask you another question. A letter was written saying that if you cash this check, you're rescinding the contract. It was rescinded. Let's leave the whole accord and satisfaction issue aside. Okay. It's rescinded. What's he suing on? Well, no. That's not what the letter said. The letter said we're sending you this check. If you cash the check, we're going to deem it to be rescinded. And if you don't cash it within 30 days, we have to be focused on what's said here, because the carrier had the ability to craft it in the way it shows. If you don't cash it in 30 days, it's deemed rescinded. He cashed it about 9 or 10 months later after he went through an appeal and went through every possible basis he could to undo what he knew and believed was wrong because of the underlying circumstance. Your Honor, it's a misstatement to suggest that if he doesn't cash within 30 days, it's deemed to be. I argued three or four points. Let me add them. But he did cash it. Your Honor, he cashed it 9 or 10 months later after he had gone through an appeal. It was inadvertent, as I urged on in my brief. I'm really not understanding this argument. Okay. Very simply, the letter said here is we're rescinding for these reasons. If you disagree, you can appeal. He did. And if you don't cash the check, if you cash the check within 30 days, that's it. If you don't cash it within 30 days, it's deemed cashed and it's rescinded. Well, that's a misstatement of the California law. Fine. But he did cash it. Eventually. So what? He cashed it. It says if you cash it, it's going to be rescinded. He cashed it. Then it is at least a jury question as to whether it is inadvertent. It is at least a jury question as to whether there was consideration for that issue, of which I've urged that there cannot be consideration for. It can't be an accordant satisfaction, which is what they urge. It can't be that. I don't know why you wouldn't be happy with that finding. I mean, because the eye surgeries aren't the only omission. You also have the omission of two out of the three preexisting insurance policies. By the same agent and under Lore v. Great Republic in this State, Your Honor, an insurance agent who has admitted, and I've urged all the insurance code sections asked, and the only seminal case in the field. It is our law, and it should be our law. If the agent for the company knows something, that knowledge is deemed to be the knowledge of the company. It can't be anything else. But when you talk to an agent, you say, you are the eyes and ears of the insurance company in the field doing that application. Of course that's true. But do you age an agent or a broker? In this case, it makes no distinction, Your Honor. We see people fold in and out of that setting depending on the circumstance. This is right on the money with Lore. Lore specifically holds that. And can we just get to the end of the story for a second? Hey, he never made application for either of those two policies after he got disabled. Those policies he led last. In deference to this policy and others, which one of which he did recover on. Except that he didn't. The insurance application asked for this information, and he did not give it to them. And that's your credit. Let me go back to the irregular astigmatism, okay? This is my understanding. This is. Your Honor, could I just answer the other one? Before we go back to the. Yes. Let him finish answering my question, and then we'll go back to irregular astigmatism. Thank you. And that Lore v. Great Republic specifically says, when you are the agent, admitted agent for the company, that we look no further in California law. Because when you are the agent, you are the agent. And that, in the context of an insurance application, is what that means. That agent knew he had the other two policies. That, therefore, that information endures to the detriment of the insurance company, the betterment of the claimant in this case, because we are protecting, again, we are protecting the insured if the agent has the knowledge. If you say, for example, I'm 130 pounds, and the agent's looking at me and can tell I'm not, then we're not going to allow, we're going to say the agent has a duty to step up and correct that information. We're putting the risk at where it should be. Okay. I understand that. Now, would you please respond to Judge Bresson's question? The record I'm reading from Mr. Nassif's testimony, he says that irregular stigmatism now gives me multiple images. When did that begin changes? I've been having problems ever since probably 97, although later it's clear that it was 95. Would you view that irregular stigmatism to be a significant medical problem? Yes, sir. All right? But it wasn't diagnosed until I was home. How long have you had the irregular stigmatism since 1995? But it wasn't diagnosed until after the pulse was in effect, Your Honor. He says that, I'm reading next. Go ahead. How long have you had your irregular stigmatism? How long have you known about it since 1995? Why isn't that the end of the story? Because it wasn't diagnosed. He said how long have you known about it since 1995? This guy isn't a taxi driver. This is what he does for a living. And Dr. Thompson happened to be a physician as well. And Dr. Thompson's conditions were far, far more serious than this, Your Honor, and our Supreme Court specifically puts that risk on the carrier. The carrier had the ability to underwrite all this. The carrier had the ability to do it. The problem is they need honest answers in order to decide whether or not to accept the risk. If we accept Your Honor's reading, recitation of the facts in the way he did. How can you not accept it? I'm just reading from his transcript. Then why would he give up two policies? What was your response to Judge Nelson's question? I'm sorry. I'm sorry, Your Honor. In the context, Thompson v. Occidental creates an exception, an excuse, for those of us that don't consider something as important as it may be, even, even in the context of a physician. And I couldn't have a better case to urge on you than Thompson v. Occidental, which is the seminal Supreme Court case in this field in California. It's still the law in California. Well accepted. Read the facts of the case. He was a physician with heart condition and phlebitis, for God's sakes. What kind of a physician was he? If he was a dermatologist, there's not much of an argument. Your Honor, you're not going to let me give a quick answer to that, are you? Obviously not too good of one of you. Those who care for Owen's diagnosis. But I don't know that. I don't remember if the case focused on that. I just have to stand and say unknown as to that. But a physician he was, and a physician in training he was, and under California law, we all know he could practice any field of medicine with that medical degree. So the fact that he was or wasn't either board eligible, board certified, or otherwise in a specialty would not defeat my argument in terms of what his standard of knowledge is. And, Your Honor, we shouldn't have, back to Your Honor's point, Justice Nelson, we shouldn't have a standard that says we're going to have one standard for the physician and one standard for an attorney, who we're not really sure what asymptomatic assymptomatism is. Let's look it up. That shouldn't be the standard that's applicable here. Obviously it was not asymptomatic because he said he knew about it in 1995. I misspoke. Astigmatic. In other words, it was imperfect stigmatism, irregular stigmatism. That's what it was. He also said there was a significant medical problem. Your Honor, we understand that. And the question is, back to did he appreciate the significance of the nondisclosure? And that's the question. And, again, I think we have to look at his context in the history of this claim. He gave up those two policies that defendant is arguing that he should now be cast adrift for. If he thought they were so bad, why would he give them up, thinking that he would have to then get disability coverage with them? Why would he abandon them in deference to a newer policy? That doesn't make any sense here. So the point I'm trying to make, weave our way through here, is we have a standard in California for California citizens as to this type of application. It is very protective of them. And we should not read in or out, and I just happen to be a physician in the underlying case, but we shouldn't read in or out those minor matters upon which all of us can occasionally make a mistake. Do we remember that we were hospitalized or we went to the emergency room eight years ago? Sometimes we don't remember that in the context of an application. Do we remember that you have an existing medical condition of heart disease or phlebitis or anything else? That's not where we have to wind up. Let me suggest to you, though, we have a solution. A solution is this case was decided in a summary manner. There is still a trial to be a day, a trial day to be had here. Juries are to decide that question. What appellant suggests is that this, these are questions ripe for a jury. And, Your Honor, to suggest that we take that one sentence that Your Honor so aptly points out, I suggest that if we were to ask, and Dr. Nassif was here with us, he might have a little more, he might be able to put a little finer point on that sentence in the context of advocacy of counterpoint and point and cross-examination and examination, I think we might get to the bottom of that. Reading that, it does not get us there. That's why we needed a judge and a jury. There are also several other statements in the record that he knew in 1995 that he had irregular statements. Again, Your Honor, let me just humbly suggest that I will think that would be the basis upon which a jury would decide that. I'll just go ahead, unless the Court has any other questions, I'll go ahead and return. May it please the Court, good morning, Your Honors. My name is Dan McGuire, and I'm here to represent Hartford. There are two issues presented on this appeal today. The first one is whether there was a basis for Hartford's rescission of Dr. Nassif's insurance contract. And the second one was whether Dr. Nassif accepted that rescission. The answer to both questions is yes, there are no questions of fact that remain, and therefore, we're here to ask that the Court affirm the district court's judgment. On the second question, does it matter whether it was an accord and satisfaction, or does it just matter whether it was a rescission? Ultimately, the answer is no, it doesn't matter. I would say the accord and satisfaction would be gravy if you'd want to put it in the vernacular. Would be what, I'm sorry? Would be gravy if you put it on the vernacular, because the basis for the rescission was the misrepresentations, which were material, and the communication of that rescission, the refund of the premium, which was then accepted by Dr. Nassif by cashing the check pursuant to the terms of the notice. And if there was, in fact, a rescission, then he couldn't sue on the contract. That's right, because there is no contract to be void from the inception, Your Honor. So this fairly elaborate inference the district court did where he inferred that you were waiving the refund of the benefits, which seems sort of counterfactual since you're suing for the refund of the benefits. We were suing for the refund of the benefits, Your Honor. It doesn't really matter. I think you're right. I don't think it matters. I think all that matters is whether or not the rescission was in accordance with the code, and whether Dr. Nassif accepted the rescission, which he did, by cashing the check. In order to avoid the conundrum that your opponent points out, that he had 30 days, and if he didn't return the money within 30 days, it was deemed rescinded anyway. Would his only option have been to send the check back within the 30 days? Yes, Your Honor. Otherwise, it's rescinded. Otherwise, it's rescinded. Well, if he retained the check, right. Right. I mean, I suppose the direct answer to Your Honor's question is it doesn't matter in the context of the case because he cashed the check, but under that hypothetical situation, that would be my response. So that was his option. That was his option. Return the check or be rescinded. Right. Now, did you pay any, did Harper pay any benefits to Dr. Nassif? Yes, Your Honor. Approximately $17,000. Now, was there a counterclaim here to get the return of the benefits? Yes, Your Honor. There was. And Judge Brewster determined in the accord and satisfaction argument that we waived our right to collect that overpayment in the litigation because there was an accord and satisfaction, and that $17,000 was the consideration for that accord. Well, that's sitting in a bunch of inferences, and it was never, the letter doesn't say that this was going to be in settlement, and you didn't say that you were waiving the benefits, and in fact, you weren't waiving the benefits, but you tried to sue on them. So that seems fairly flimsy. Well, I agree. Perhaps he was trying to do some kind of equitable result here that overlooked minor technical ground. That was my impression, Your Honor. I think the case rose and fall on the cashing of the check as far as whether or not Dr. Nassif accepted the decision. As far as what Judge Brewster's thought processes were in crafting that order, I can't be sure, but I think in the context of this appeal, it doesn't really matter. And you didn't cross appeal saying that, no, it wasn't in accord and satisfaction? No, Your Honor. Okay.  Yes, Your Honor. Okay. With regard to the Hartford's right to rescission, it's twofold, as we know. The first is the misrepresentation of the other disability insurance, and the second is the misrepresentation of the health history. With regard to the other insurance, which was the subject of the initial argument, Dr. Nassif didn't tell us that he had $12,400 in other coverage at the time he completed the application. Was that material to the risk? Yes, it was. Let's just sort of know, never mind, though, because if you had known it, he apparently intended to eliminate some of it, and he did eliminate some of it eventually before he – and he didn't recover on more than that amount. And if you had – if he had given you the information and you had objected, he would have gotten rid of it earlier, but it didn't really affect you in any way. It did, Your Honor, because he had that coverage at the time the policy was written. I know, but if he had reported it and you had said, we can't insure you for this extra amount, he would have said, fine, I'll cancel the policy, because he – one of the other policies, because he did cancel one of the other policies. So in the long run, it really wouldn't have mattered. Your Honor, the time to respond to your question, the time to determine the materiality is the time of issue of the policy, because that's when the policy is underwritten. I understand that, but it's quite a technical argument, because in fact, it wouldn't have come to pass. Right? If you had objected to the amount of insurance, he would have canceled, because he did cancel. Well, we don't know what he would have done, but I can say that – Well, we do know it, because we know what he did. Well, we know what he did, but we don't know at the time of the underwriting if he had told us the truth, what Hartford would have – Hartford would have declined the application. It's like saying to the bank robber, well – If you had said to him, you've got to – this is too much insurance, he would have come back and said, okay, now I don't have so much insurance. I guess that's possible. We could guess about that, but it's not in the record. As far as what – I'm suggesting it is in the record, because he did cancel it. He did cancel before the claim, but not before the policy was underwritten. I understand. That's correct. I mean, those are the facts. But my response to that would be, as far as its relevance to this appeal, is that it would be the same as saying to the bank robber, well, you can return the money, you know, after you rob the bank and there will be no prosecution. The time to determine the crime is the time it's committed. And it's not a game of cat and mouse. I mean, the insurer has the right to rely on what the applicant says. The applicant has the obligation to tell the truth. And that was not done here. Over-insurance was not some kind of hidden requirement. They asked for that information right on the policy. It's question number five. He completed that portion of the application. He told us that he had the Provident policy, but he didn't tell us about the rest of it. It's material because Hartford had an issue and participation limit of $10,000, which was exceeded when you look at his other coverage. That means that Hartford would not have issued the policy, would not have issued any policy, if Dr. Nassif had it known the truth. And Dr. Nassif's arguments in response to that fail to raise a question of fact. The main one seems to be that the agent's knowledge is imputed to Hartford. And on that point, I think it's important not to put the cart before the horse. We've got to figure out first what this so-called agent, if that's what he is, if he's not a broker, what he knew. Well, what did he know about these other policies? About the century policy, remember now there were three other policies that he had, and he only told us about the Provident policy. But he had one from Century Insurance Company. And what did Yacker know? He knew that Nassif agreed in writing on the Provident application to reduce that coverage from $4,000 to $2,000. He never did that. The U.S. life policy was purchased in 1992. That was without the knowledge of Mr. Yacker. The Provident policy, which was purchased in 1991, the indemnity for which was later increased in 1996, that increase was done without the knowledge of Yacker. Even if we were somehow to stretch and say that somehow Yacker knew these things, even though there's no evidence that he did, and in that regard, Dr. Nassif doesn't even submit a declaration in the lower court saying that he did. So there's no evidence of that. Even if so, it's insufficient to raise a triable issue, because it doesn't relieve Dr. Nassif from his own responsibility for his own misrepresentations. There were other arguments made in response to this on the materiality issue. The conditional receipt argument was raised, which I'd just like to address briefly. A conditional receipt, as you probably know, is temporary insurance that's given to an applicant when the applicant pays premiums for the policy in between the time of the application and delivery. That's only fair. The applicant is paying for something, which is going to be issued later on. So there's a bridge time, and the law has said there's temporary insurance in between the application and the policy when you pay the premium. And to memorialize that, conditional receipt is issued. And this conditional receipt was issued, of course, in this case. It says that the temporary insurance amount is for the lesser of three amounts. First, the amount applied for. Second, a reduced amount based on the underwriting rules. Or third, $20,000. Now, we know that the issue and participation limits are $10,000, so it's going to be limited by the issue and participation guidelines. And besides, the temporary insurance issue is really a nonissue because that only takes place until the actual policy is issued, which it was here in January of 1997. The next argument was insurable interest. We think that's inapplicable, too. The purpose of insurable interest is to avoid a gambling contract. An unlimited insurable interest in one's own life doesn't mean that an insurance company has an obligation to issue whatever policy the applicant asks for. The insurance company is entitled to decide for itself which risks it will accept. The next argument was Section 10369.6, can't insure the same risk twice. Again, sounds fair. I have something worth $100,000. I place a $100,000 policy with Company A and Company B. I lose a $100,000 item. I don't get $100,000 from each company. They apportion the loss because they can't have double insurance. But that doesn't apply. It applies only to valid insurance policies in the first place, as Judge Brewster said, but also each dollar of Dr. Nassif's income is a separate risk. So that policy provision, I mean, that statutory provision doesn't apply. He argues that Iowa law applies. It's not even in conflict with California law on the relevant issue, which is intent to deceive. And Judge Brewster ---- And that Iowa law actually should apply, but I don't know why that matters. Why wouldn't Iowa law apply? What's the argument for California law applying? It's the foreign states law. Judge Brewster determined that the foreign states law applies under the Erie Doctrine. Dr. Nassif came out to California and filed the suit. But there's still a choice of law question then under California law. And it seems to me that under California law, they would choose Iowa law because he was in Iowa when this was issued. The company is not a California company. Why would we be applying to California? Why don't we apply California law to this? Under the California interest balancing test, Your Honor, to determine choice of law. What's the interest? The first ---- well, we don't get to the interest until we determine there's conflict. If there's a ---- No. Well, that's true. I agree with you about that. So there is none. And so that's ---- I guess that's where Judge Brewster was going. It's not spelled out particularly in the order, but that was my read on it. The second issue on the misrepresentations are the medical misrepresentations. As we pointed out, he hadn't said he hadn't consulted with a physician or advised to have any treatment within the last five years. He had no known disorder of the eyes or disease. In fact, of course, he had eye consultation, diagnosis, treatment, and surgery. And his response to that is that these are minor indispositions. Well, I really do feel like this whole case on this issue has been focusing in all ---- in really the wrong place. I mean, if he didn't have what he ---- what I understand to be a different issue than a regular astigmatism and regular myopia, and he had simply had these procedures, I think he'd be on pretty weak ground to be claiming that that was really material, given the fact that everybody and his brother has the same things and that the surgery apparently took one minute and wasn't ---- it's called surgery, but it's something you go in and it's done and you're gone. And that's exactly what Dr. Nassif argued. He said that these are immaterial conditions. Everybody has astigmatism. Many people get this operation. Cataracts are irrelevant. A lot of people have cataracts. Cataracts is different. I don't think cataracts is the same. But if it weren't for the ---- to me, what matters here is the fact that he says that he knew in 1995 that he had a condition that he now says is in large part a disabling condition and is serious. That's a different matter. While you're focusing over here on the fact that he had some surgery at the time for what was, you know, took a minute and a half and was designed to correct a condition that 50 percent of the population has, I don't know. Well, to answer your question, Your Honor, the strongest part of my case is that he had this irregular astigmatism and he didn't disclose it. He didn't disclose it on the application. He didn't disclose it during his claim. During his claim, he said it was first diagnosed in 1997. Hartford didn't know he was lying about that. We didn't know until we got the trial transcript and the other lawsuit in Michigan that he had been diagnosed in 1995. But clearly that is the most serious medical misrepresentation that's present in this case. As far as his appreciation of the significance, the man is an eye surgeon. Who better to appreciate the significance of this than an eye surgeon? Your opponent, in answer to my question about this, said totally answered by the Thompson case. Thompson, you know, there's no problem. What's your response to Thompson? Thompson says that the company that the insurer or the applicant doesn't have any obligation to to disclose minor indispositions or things that he's not aware of. In this case, Dr. Nassif had the regular astigmatism, which a is not a minor indisposition. It's a sight-disabling condition or potentially sight-disabling. And two, he knew about it. He knew about it because he'd been diagnosed with it as he testified under oath in a court in Michigan in 1995, which was over a year before he filled out our application. The second question is whether Dr. Nassif accepted the rescission. The answer to that, yes, he cashed the check. What did that do? It accomplished a mutual rescission. We already touched on the accord and satisfaction issue. But the mutual rescission issue is something I'd like to address briefly. First of all, the rescission was effective pursuant to the terms of the civil code. It was communicated, writing, within the contestable period, and the premiums were refunded. Second, Dr. Nassif consented to the rescission by cashing the check. The letter says cashing of the check is acceptance. In Thompson, by the way, Dr. Thompson never cashed the check. The response is from Dr. Nassif, well, it was inadvertent. And there's a case that we discussed in the brief, that red alarm case, the lockbox case, where the check was deposited in the so-called lockbox, which means that the bank automatically deposits it. So the depositor didn't even know the check was there until after it had been deposited. The depositor then was made aware of the deposit when he got a copy of the letter. He promptly objected. Obviously not the situation here. Dr. Nassif cashed the check without protest, without qualification, without complaint. He never returned the money, never offered to return the money. He never raised the issue at all until we're in a summary judgment stage at the trial. So with my remaining time, I'd like to just ask the Court if they have any questions. I have a very silly question, just because I'm curious. You have your brief capitalizes Nassif and Hartford all the way through. I've seen this form elsewhere. I find it very annoying. Is there a reason why you do that? Well, there's a reason. There's a very good reason not to do it from now on, and that's because you just said that. I'm not the only one. Well, why do you do it? Well, the answer to the question is that when I first started practicing, I've been at the firm that I'm at since I started practicing in 1985, and that's the way I was taught to do it. Really? I never questioned it. And when I first saw it, I probably had a similar reaction, but now I'm going to probably announce that. There are other people who do it, but it's really odd. Anyway, that's my only question. I think the purpose is just to distinguish if you have a multiparty case, to find out when you're talking about people who's a part of the case and who's not. Don't they do it more often in California state court? Well, we do it in both, but I'm not sure about that. I think there's more of a practice in state court to get the busy judge's attention. Anyway. When you go back to your firm, you might say that at least two members of this panel have the same problem. I would be happy to share that information, and I thank Your Honor for your time. Thank you. Thank you. If it pleases the Court, perhaps a rebuttal argument can put the closest and best focus on the argument. First of all, there is no insurance law or case law that says that an insurance company is allowed to condition a rescission on a letter that says you have 30 days to act, to mail the check back. Your Honor, if you recall, Justice, you asked, well, does that mean he just had 30 days to act? Well, counsel said, yes, he does. So that means it's a 30-day statute of limitations. Well, I was going to say, but we would have a real problem if they had checked if you had not sent it back within the 30 days and it was the 45th day and they were claiming that you were rescinding it. Now, you'd have a pretty good argument, but that's not what happened. You did send it. You did end up cashing it. No, no, no, Your Honor. He cashed it 10 months later. I understand that. And in fact, I have to lend right into another one of my points. Counsel told me something I'd forgotten in his argument. He didn't meet the code on rescission. This policy under the terms was effective January of 1997, undisputed. He cashed the check, in their brief, I can point to you the record, in July of 99, more than two years later. It's beyond the contestable period when he cashed the check. It does not meet the code. I'm sorry I didn't catch that point until now. That we need to look at. If I could, let me just urge you, the citation of the effective date. Did you raise that as a defense in the district court? You know, Your Honor, I didn't even see it until right now. So the answer is no. The answer is no. So if that's the usual statute of limitations-type defense, if you don't waive it, it's out the door, isn't it? Well, it's not a statute of limitations. No, no. This is. Well, that's similar to a statute of limitations. No, no. Incontestability says if you don't raise it by a certain date, you've lost it. No, no. Right? No. Let me flip it the other way. Here you have to effect rescission. You have to complete rescission within two years. Is that the way you read incontestability? Let's look at what the code says. So here, the effect, the cashing of the check didn't occur. And let me just cite to you, it's their record, page 78. It's on page 10 of their brief. That's one point that I, they, this did not happen within two years of the effective date or of the attended rescission. As to the 30 days cashing of the check, it couldn't be that because you can't have that limitation. And I want to just urge on you just to- Do you have the code provision in front of you? Could you read it, please? The rescission section, I do not have it right. I didn't even think of it until just now, Your Honor. So forgive me for not having the code. It's in our brief. The code section is in our brief. And in my appellant's excerpt of record at 144 is the attempted rescission letter. And it says, In close of the check for the 2100 represents a return of all full premium already cashed. Cashing this check or retention for more than 30 days will constitute your acceptance of the rescission. There is no case law. There is no authority. There is no argument that that is a proper application. And one last point. As to Your Honor's point as to the reading from the record as the irregular astigmatism caused him to see images and all, that was before the surgery, Your Honor, in 1995. He was healed from that. The problem for his disability was the cataracts that grew after that in 1997. That's certainly not what I said. Well, I believe with all deference, I believe that's the basis for his claim. Well, cataracts is a lot different than astigmatism. Totally different. Well, yeah. You're talking about different parts of the eye. It's exactly right. It's the internal part of the eye. And it's a film that grows inside that prevents us to see. That's the problem. All right. Thank you, counsel. Thank you, Your Honors. This session of the Court will be adjourned.
judges: T.G. Nelson, Wardlaw, Berzon